**Rodney LENNON, Plaintiff,**

v.

**NORFOLK AND WESTERN RAILWAY COMPANY, Defendant.**

**No. Civ. 1:98CV358.**

United States District Court, N.D. Indiana, Fort Wayne Division.

Dec. 19, 2000.

---

Daniel A. Roby, Roby and Hood, Fort Wayne, IN, Roger C Denton, Schlichter Bogard and Denton, St. Louis, MO, for Rodney Lennon, plaintiff.

John C. Duffey, Geoffrey L. Blazi, David A. Starkweather, Stuart and Branigin, Lafayette, IN, for Norfolk & Western Railway Company, defendant.

### MEMORANDUM OF DECISION AND ORDER

WILLIAM C. LEE, Chief Judge.

This matter is before the Court on a "Motion for Partial Summary Judgment" and "Motion to Exclude the Testimony of Dr. Louis Romain" filed on October 18, 1999. Plaintiff responded to that motion on November 19, 1999, to which defendant filed a reply on December 13, 1999. That same day, defendant filed a "Motion to Exclude or Limit the Testimony of Dr. David Schreiber."

On January 6, 2000, this Court held a telephone conference during which the pretrial and trial dates were continued and discovery was extended so that the parties could more fully develop the medical issues

in this case. The parties were also directed to file further briefs at the conclusion of that discovery.

On August 21, 2000, defendant filed a "Supplemental Brief in Support of Its Motion for Partial Summary Judgment and Motions to Exclude Testimony of Dr. Romain and Dr. Schreiber." That same day, there was filed "Plaintiff's Submissions in Supplemental Response to Defendant's Motion to Exclude Testimony of Dr. Schreiber" along with "Plaintiff's Submissions in Supplemental Response to Defendant's Motion to Exclude Testimony of Dr. Romain." On August 24, 2000, defendant file its "Reply Brief in Support of Its Motion for Partial Summary Judgment and Motions to Exclude Testimony of Dr. Romain and Dr. Schreiber." Plaintiff then filed a "Supplemental Response to Defendant's Motion for Partial Summary Judgment" on August 28, 2000.

This Court heard oral arguments on September 15, 2000, after which the proceedings were stayed for a brief period so that the parties could pursue the possibility of settlement. After those discussion proved fruitless, defendant filed a "Supplement to Oral Argument and Supplemental Authorities" on October 17, 2000. Plaintiff filed a "Response to Norfolk & Western Railway Company's Supplemental [sic] Oral Argument and Supplemental Authorities" on November 7, 2000 to which defendant filed a reply on November 14, 2000.

For the following reasons, the motion to exclude the testimony of Dr. Louis Romain will be granted in part and denied in part. It will be granted with respect to defendant's request that Dr. Romain be prohibited from testifying that plaintiff has multiple sclerosis as a result of a fall which occurred during plaintiff's employment with the defendant or that such a fall could result in the triggering or exacerbation of MS but in all other respects will be denied. The motion for partial summary judgment will be granted. The motion to exclude or limit the testimony of Dr. David Schreiber will denied.

### Factual Background and Procedural Posture

The relevant facts (which for present purposes are construed in plaintiff's favor) are as follows:

Plaintiff Rodney Lennon was an employee of the defendant Norfolk & Western Railway Company. On December 4, 1995, plaintiff was working as a signal maintainer for the railway. That evening, he was called out to relieve another signal maintainer who was in the process of fixing a signal.

Plaintiff was unfamiliar with the area to which he was supposed to report and hence he had some difficulty locating his co-worker. Plaintiff got out of his truck and began to search on foot. When he began to walk back to his truck, plaintiff slipped and fell forward, hitting his forehead on a concrete foundation. Plaintiff, nevertheless, was able to return to his truck and locate where his co-worker was working. However, when he realized that he was bleeding, plaintiff drove himself to the St. Joseph Medical Center Emergency Room.

At the St. Joseph Medical Center, plaintiff received fours stitches on the bridge of his nose and six on his forehead. The records from the hospital indicate that plaintiff was alert and denied any loss of consciousness. After about an hour, plaintiff was released and told to return in three days for removal of half the stitches and then return five days later for removal of the other half.

Plaintiff returned to work the next day. However, when he report to the hospital on December 7, 1995 as instructed, plaintiff complained of severe headaches at night. A CT scan showed no hematoma, mass, or edema. Plaintiff was given medication for his headache and told to return two days later for the removal of his stitches. He did so and his stitches were removed.

Plaintiff returned to work with no further complaints. On December 27, 1996, plaintiff was suspended from work pending an investigation into alleged falsification of

his overtime pay requests. Four days later, plaintiff went to his family doctor complaining of headaches, memory problems, and feeling "spaced out."[1]

Plaintiff was referred to Dr. Louis Romain, a Ft. Wayne neurologist who diagnosed plaintiff as having multiple sclerosis (MS). It is plaintiff's contention that his injury rendered him unable to work and he has not worked since he was suspended.

Plaintiff brought suit against the defendant under the Federal Employers' Liability Act (FELA) for injuries he sustained in his fall on December 4, 1995. Defendant's motion for partial summary judgment and motion to exclude evidence from Dr. Romain is directed at the contention that plaintiff's fall caused the onset of MS since, according to defendant, there is no reliable scientific evidence that an injury to the head as occurred here could proximately cause MS. In response, plaintiff has taken the position that the issue of whether plaintiff has MS (as diagnosed by Dr. Romain) is really a collateral matter since Dr. Romain has unequivocally testified that in his opinion, plaintiff sustained a brain injury and spinal cord injury as a result of his fall. Further, another neurologist, Dr. Schreiber, of Alton, Illinois, performed an MRI scan of plaintiff and opined that the fall of December 4, 1995, caused shearing forces which in turn caused bruising of the white matter of the brain, ultimately leading to demyelination. Dr. Schreiber has further opined that as a result of the head injury, plaintiff suffers from thought disorder, memory deficits, left-sided sensory deficits, as well as muscle and ligamentous damage to the structures in and around the cervical spine which made pre-existing cervical arthritis and disc abnormalities symptomatic.

In reply, defendant asserts that the recharacterization of his injuries aside, plaintiff cannot establish a link between his "minor" injury and his ailments. That is, "there is no reliable scientific evidence that trauma can cause demyelinating plaques for lesions of the type which appears in the MRI's of Lennon's brain, regardless of whether such demyelination is called multiple sclerosis of 'demyelination of the white matter.'"[2]

The present motions raise the issue of whether either Dr. Romain's or Dr. Schreiber's testimony should be admitted pursuant to Federal Rules of Evidence 702. This in turn necessitates application of the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

### *Daubert, An Overview*

*Daubert* profoundly changed the admissibility of scientific expert testimony in federal courts by abolishing the doctrine of "general acceptance" as announced in *Frye v. United States*, 293 F. 1013 (App.D.C. 1923). Instead, *Daubert* direct that the district judge is to perform a gatekeeping function with respect to the admissibility of expert testimony. That is, "the trial judge is [to] determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.*, 113 S.Ct. at 2796.[3]

1. Up to the time of suspension, plaintiff had not missed a single day of work since his fall over a year before.

2. Essentially, defendant asserts that although Dr. Schreiber disagrees with Dr. Romain's description of plaintiff's neurological condition as multiple sclerosis, he acknowledges that the condition he calls "demyelination of white matter" is essentially the same as that

diagnosed by Dr. Romain as MS. Hence, the arguments relating to the exclusion of Dr. Romain's testimony apply with equal force to that of Dr. Schreiber since the latter "merely calls the neurologic condition 'demyelination of the white matter' instead of MS."

3. In that case, a products liability action, plaintiffs sought to introduce expert testimony that their mothers' ingestion of Bendectin

■ While the Supreme Court did "not presume to set out a definitive checklist or test," it did list several factors which should be considered including: whether a scientific theory or technique has been or can be tested; whether the scientific theory has been subjected to peer evaluation and publication; the actual or potential error rate and existence of any standards controlling the technique's operation; and whether the theory has been generally accepted in a particular field.[4] *Daubert* thus teaches that " 'the trial judge must determine whether [an expert's] opinion was grounded in the "methods and procedures of science," *Daubert*, [cite] and whether such testimony had sufficient 'factual underpinnings.' " *Goodwin v. MTD Products, Inc.*, 232 F.3d 600 (7th Cir.2000) (quoting, *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 586 (7th Cir.2000)).

That said, *Daubert* should not be applied woodenly. "Anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." *Tuf Racing Products v. American Suzuki Motor Corp.*, 223 F.3d 585, 593 (7th Cir.2000). The principle of *Daubert* is merely that if an expert witness is to offer an opinion based on science, it must be real science, not junk science. *Id.*

As noted, the Court in *Daubert* "emphasized that it did 'not presume to set out a definitive checklist or test,' and that the district judge's inquiry should be 'flexible,' " and hence "there is no requirement that the district judge consider each one of the[ ] 'guideposts' when making an admissibility ruling under Fed.R.Evid. 702." *Bourelle v. Crown Equipment Corp.*, 220 F.3d 532, 535 (7th Cir.2000). Conversely, however, "[w]here the proffered expert offers nothing more than a 'bottom line' conclusion, he does not assist the trier of fact." *Clark v. Takata Corp.*, 192 F.3d 750, 759 (7th Cir.1999) (citing *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 318–19 (7th Cir.1996)).[5]

### *Daubert's Application in this Case*

Defendant's present motions are directed to the proposed testimony of two doctors—plaintiff's treating neurologist and a consulting neurologist. Application of *Daubert* to each one's proposed testimony will be considered in turn.

### *Dr. Romain*

As indicated, Dr. Louis Romain has diagnosed plaintiff as having MS. He has also taken the position that plaintiff's MS occurred (or was exacerbated) as a result of plaintiff's fall while employed by the railroad.

MS is a disease of the central nervous system wherein the myelin which covers the nerve fibers become depleted—a process known as demyelination—resulting in the formation of patches of inflammation (known as plaques or lesions) in the white

during pregnancy resulted in birth defects. That testimony was intended to rebut numerous epidemiological studies which had failed to link the drug with birth defects by showing that *in vitro* and *in vivo* testing established a link. The trial court denied its admission. On certiorari, the Supreme Court mandated the above-noted change with respect to the admissibility of expert testimony.

4. The failure to set forth a definitive test was in keeping with the notion that the inquiry envisioned under Rule 702 of the Federal Rules of Evidence was a "flexible one." Id. In response to *Daubert*, Rule 702 of the Federal Rules of Evidence was amended to read as follows:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. F.R.Evid. 702. That amendment became effective on December 1, 2000.

5. That is to say, "qualifications alone do not suffice. A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are reliable and relevant under the test set forth by the Supreme Court in *Daubert*." Id.

matter of the brain, brain stem, optic nerves, and spinal cord. As the plaques advance they become scarred or sclerotic. As demyelination occurs, the nerve fibers are no longer able to conduct neural impulses in their normal way. Common symptoms of MS include vision loss, double vision, numbness and/or weakness of the limbs. The exact etiology of MS remains unknown although there is general agreement that genetic factors may be involved and that some people may become potential demyleinators (and hence potentially contract MS) as a result of exposure to some environmental factor such as a viral infection.

Whether physical trauma may trigger or precipitate MS has been a topic of much debate in the medical community since the latter part of the nineteenth century. That debate rages today.

As Judge Clement of the United States District Court for the Eastern District of Louisiana has observed:

> ... Defendants' Daubert motion places this Court squarely in the middle of a complex, and often heated, debate within the medical world.

> According to the National Multiple Sclerosis Society, "[t]he role of trauma in causing MS or in triggering subsequent MS exacerbations (also known as attacks, relapses or flares) has been the subject of controversy for many years." The National Multiple Sclerosis Society (Feb. 9, 2000) http://www.nmss.org/info-frame.html. "[D]espite the long history of this idea, the proposed causal link between [physical trauma or psychological stress] and MS has yet to be established or refuted conclusively". D.S. Goodin et al., The Relationship of MS to Physical Trauma and Psychological Stress: Report of the Therapeutics and Technology Assessment Subcommittee of the American Academy of Neurology, 52 NEUROLOGY 1737, 1737 (1999) (hereinafter "the Goodin Report"). In 1999, a subcommittee of the American Academy of Neurology headed by Dr. Douglas S. Goodin, published an influen-

tial and well-respected review of several studies of the relationship of MS to physical trauma and psychological stress "in an attempt to define the current state of knowledge in this area." Id. at 1738. The Goodin Report acknowledged that "it seems reasonable to conclude that a causal relationship between trauma and either the onset or the exacerbation of MS is biologically plausible", id., but, after thoroughly reviewing several studies, concluded that "[o]n the basis of strong and generally consistent Class II evidence, any posited association of trauma, especially head trauma, with more than a small effect on either MS onset or MS exacerbation is excluded. Moreover, the preponderance of Class II evidence supports no association between physical trauma and either MS onset or MS exacerbation."

Despite the authoritative weight of the Goodin Report, there are liable to be members of the medical profession who disagree with its conclusions. For example, in an earlier literature review, Harvard Medical School's Dr. Charles M. Poser, a vocal proponent of the trauma theory, criticized the underlying assumptions of several studies that attempted to establish or deny causal relationships. Charles M. Poser, The Role of Trauma in the Pathogenesis of Multiple Sclerosis: A Review, 96 CLINICAL NEUROLOGY AND NEUROSURGERY 103 (1994). In particular, Dr. Poser argued that researchers using epidemiological and biostatistical evidence unjustifiably "assume that MS patients are not only genetically and immunologically identical, but that their disease has reached the same extent of clinical and pathologic involvement, and a similar degree of activity at the time of trauma." Id. at 108. In Dr. Poser's view, "just as MS patients will not necessarily have exacerbations after all viral infections, it is illogical to expect new or more severe symptoms after every episode of trauma in every MS patient". Id. at 106.

Although the parties have not brought to the Court's attention any statements by Dr. Poser that post-date the Goodin Report, it is likely that he would object to the assumptions underlying the Goodin team's efforts.

Thus, there is an active debate within the medical community as whether physical trauma can cause or exacerbate MS. *Thomas v. Poole,* 2000 WL 158456 (E.D.La.2000) (footnotes omitted). Although making those observations, Judge Clement did not have to decide which side of the medical debate he would accept since there was no witness in that case which was going to testify that trauma exacerbated the MS condition of the plaintiff in that case.

Much of the literature and many of the studies referenced by Judge Clement have been presented to the Court in this case. A review of the same reveals generally the following.

Early studies suggested a link between trauma and the onset or exacerbation of MS. According to a Report of the Therapeutics and Technology Assessment Subcommittee of the American Academy of Neurology, support for the link could be found in several studies: In 1952, McAlpine and Compston reported an association between trauma and MS in what is considered to be the first controlled study of the relationship. That study reported a history of trauma within three months preceding MS in 36 of 250 patients. Shortly thereafter, in 1961, Ridley and Schapira reported increasing MS symptoms following operations on 8 of 57 patients. A few years later, in 1964, Miller described 7 cases of MS which developed less than a week after a traumatic injury. And, in 1985, Kelly noted that in each of 14 MS patients, there was severe exacerbation of MS symptoms within 3 weeks following thalamotomy.[6] *See,* D.S. Goodin, *The Relationship of MS to Physical Trauma and Psychological Stress,* American Academy of Neurology, Neurology 1999:52, pp. 1740–42 (1999) (hereinafter the Goodin report).

More recently, the trend is decidedly away from a finding of a link between trauma and MS. Indeed, McAlpine (from the McAlpine and Compston report in 1952) later took the position that the "validity of these conclusions can be questioned on the grounds that the data on which they are based lacked statistical proof" and that "better planning would have produced more reliable results." Douglas McAlpine, *et al.,* MULTIPLE SCLEROSIS: A REAPPRAISAL, p. 77 (E & S Livingston, Ltd., 1965). Still later, the McAlpine textbook on Multiple Sclerosis published in 1991 stated that the view that trauma may trigger MS may be but a "hypothesis [ ] based upon the unproven primary role of breach of the blood/brain barrier in the pathogenesis of the plaque." W.B. Matthews, *et al.,* MCALPINE's MULTIPLE SCLEROSIS, p. 115 (2d ed., 1991). The most recent version of that textbook takes the position that the course of MS is "unaltered by trauma ... and that trauma and other exogenous life events influence neither the disease nor the clinical course of multiple sclerosis." Compston, *et al.,* MCAPLINE's MULTIPLE SCLEROSIS, p. 204 (3d ed., 1998).

Recent studies likewise support the notion that there has not been established a causal link between MS and trauma. In 1991, Dr. Sibley (a defense expert in this case, on whom more later) and his colleagues at the University of Arizona published a study which followed 170 MS patients and 130 persons of the same age and sex who did not have MS over a period of eight years. Every thirty days the participants filled out a questionnaire which asked, among other things, about physical trauma. The MS patients were also neurologically examined every three months.

**6.** There were also other early studies which suggested the opposite. For example, in 1954, a study by Kurland showed no significant association between head injury resulting in loss of consciousness and MS. Also, in 1968, Alter and Speer published a study which showed no significant association between head trauma and the onset of MS.

The upshot of the study was that there was no evidence of any statistically significant association between physical trauma and the aggravation or exacerbation of MS. Sibley, *et al.*, *A Prospective Study of Physical Trauma and Multiple Sclerosis*, Reprinted in Journal of Neurology, Neurosurgery, and Psychiatry, 1991.

Then, in 1993, Kurland and colleagues at the Mayo Clinic published a study on the relationship between MS and trauma. That study was based on the records of the Mayo clinic. Researchers identified 819 Olmsted County residents (where the Mayo Clinic is located) with head injuries who had been between the ages of 15 and 50 years old (the age range of those most at risk for developing MS) to assess the likelihood of developing MS as a result of significant head trauma. Only two later developed MS, one three years after the injury and the other 21 years after the injury.[7] Additionally, analysis of 164 patients who had MS showed that none who had a significant head trauma within six months of the onset or aggravation of MS.[8] Siva *et al.*, *Trauma and Multiple Sclerosis: A Population–Based Cohort Study from Olmsted County, Minnesota*, Neurology 43 (October 1993).

The studies from the University of Arizona and the Mayo Clinic, led the Medical Advisory Board of the National Multiple Sclerosis Society to issue an opinion on the possible role between MS and trauma in 1992. After briefly overviewing the two studies, that body expressed the opinion that the studies "do not indicate that traumatic injury is a precipitating factor in either the onset of exacerbation of MS symptoms."

Most recently, in June 1999, the American Academy of Neurology through its Therapeutics and Technology Assessment Subcommittee overviewed the studies which had been conducted thusfar. With regard to physical trauma and MS, it reached the following conclusion:

> On the basis of strong and generally consistent Class II evidence, any posited association of trauma, especially head trauma, with more than a small effect on either MS onset or MS exacerbation is excluded. Moreover, the preponderance of the Class II evidence supports no association between physical trauma and either MS onset or MS exacerbation.

Goodin report, p. 1744.[9]

Despite what may appear to be an overwhelming weight of recent authority discounting a causal association between trauma and MS, there are opponents to that notion. Indeed, the publication of the Goodin report itself prompted the writing of several letters to the editor indicating disagreement with the report. Drs. Chauhuri and Behan indicated that they were "distraught and disappointed" by the report particularly since they had seen "over a period of 5 years a total of 39 cases of clinically definite MS after cervical whiplash injury."[10] Dr. Lehrer wrote to protest that his review of the most recent literature presenting Class I evidence from animal study experiments which "clearly proves that the acceleration injury to the brain releases cytokines within the CNS that are universally accepted as precipitants of exacerbation in MS and also leads to disruption of the blood-brain barrier" was excluded, particularly since "experimental injuries in human subjects are out of the question" and thus reliance must be

---

7. None of the other 817 patients (who were followed for an average of 10 years) developed MS.

8. Thirty-nine patients had a trauma other than a head injury and in only one of these cases did the trauma precede the onset of MS.

9. Prior to this report, a study by Dr. Gusev (which was referenced in the Goodin report)

found "that head trauma was not significantly associated with a higher risk of MS."

10. The letter went on to note, however, that "[t]hese data are currently in the process of being presented as a report that should create an awareness of the likely association between specific types of physical trauma and MS."

made on animal studies "as well as extrapolation of data from humans with more severe head injuries."[11] See, Correspondence, NEUROLOGY 2000; 54:1393–1395 (2000).

Among the letters to the editor was one penned by Dr. Charles Poser. He, perhaps more than any other, has been the most vociferous in expressing his view that trauma can in fact exacerbate MS. The upshot of his view is that "[t]he role of mild, concussional trauma to the CNS in producing the alteration of the BBB [Blood Brain Barrier] and therefore acting as a trigger of the facilitator in the development or enlargement of MS lesions is based upon considerable clinical, neuropathical and experimental evidence [and] must be one of the commonest causes of progression of MS, and often leads to the onset of the clinical manifestations of a hitherto asymptomatic condition." Poser, *The Pathogenesis of Multiple Sclerosis, Additional Considerations*, Journal of Neurological Sciences, 115 (Suppl.) P. S3 (1993).[12]

Without question it may fairly be said that the overwhelming weight of authority suggests the notion that there has been no conclusive showing demonstrating a link between trauma and the onset or exacerbation of MS. Under the old *Frye* standard of general acceptability this could probably be enough but *Daubert* requires further considerations.[13] "It is not the trial court's role to decide whether an expert's opinion is correct." *Smith v. Ford Motor Co.*, 215 F.3d 713, 715 (7th Cir.2000). "The trial court is limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound." *Id.*

■ This Court's gatekeeping duty requires that it "make certain that an expert, whether basing testimony on professional studies or personal experience employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238 (1999). In this Court's view, that has not been done by Dr. Romain in this case.

Dr. Romain is the only proposed witness who is set to testify that plaintiff's MS may have been precipitated by plaintiff's fall at work. Dr. Romain, a neurologist—albeit not board certified—has conducted no research or studies on MS and more specifically, has not done any research or study on the alleged association between trauma and MS. His opinion that head injury may precipitate MS is based in part upon his review of medical literature. That review, however, has been very select. Indeed, the epidemiological study from the University of Arizona and that from the records of the Mayo clinic—two studies which have received a great deal of attention were not reviewed by Dr. Romain. Nor is there evidence that Dr. Romain reviewed the

---

11. Obviously, letters to the editor have not been subjected to peer review. Moreover, in this case (as will be seen shortly) there is no suggestion that plaintiff's expert, Dr. Romain, has even reviewed those letters, let alone the Goodin report to which it was addressed.

12. Tellingly, it has not been suggested that Dr. Poser, has ever conducted studies of his own to prove his hypothesis. Rather, it appears that the bulk of his efforts has been directed towards critiquing the methods employed by others who have conducted epidemiological tests. He has, however, been somewhat prolific in his writings on the subject. *See e.g.*, Poser, *Trauma to the Central Nervous System May Result in Fomulation or Enlargement of Multiple Sclerosis Plaques,*

Arch Neurol/Vol. 57, p. 1074 (July, 2000); Poser, *The Role of Trauma in the Pathogenesis of Multiple Sclerosis: A Review,* Clinical Neurology and Neurosurgery 96 (1994) (and citations to Poser contained therein).

13. It bears noting, however, that even under *Daubert,* among the factors which may be considered in reaching the admissiblity determination is general acceptance. As the Supreme Court in *Daubert* wrote; "[w]idespread acceptance can be an important factor in ruling particular evidence admissible, and a 'known technique which has been able to attract only minimal support within the community may properly be viewed with skepticism.'" *Daubert,* 509 U.S. at 595–96, 113 S.Ct. at 2798–99.

report from the American Academy of Neurology. Other studies discounting any association were also not reviewed. In fact, it would appear that the only *study* referenced by Dr. Romain was the McAlpine study of 1952, a study, which as previously indicated has since been undermined by its own author because of a lack of a sufficient statistical proof. The other literature reviewed by Dr. Romain, save for a couple of Poser articles, appear to all predate the most recent (and apparently generally accepted) studies—most by many years and some by decades.

Dr. Romain's review of what may be labeled a lop-sided perspective of the literature on the causality (of lack thereof) between trauma and MS is, in this court's view the "antithesis of [the scientific] method." *Claar v. Burlington Northern Railway Co.*, 29 F.3d 499, 503 (9th Cir. 1994). A "district judge should assure himself, before admitting expert testimony, that the expert knows whereof he speaks." *Bammerlin v. Navistar International Transportation Corp.*, 30 F.3d 898, 901 (7th Cir.1994). This district judge is not so assured in this case. This is all the more troubling in this case given that Dr. Romain's view can only be considered to be a minority view. *See, Braun v. Lorillard, Inc.*, 84 F.3d 230, 235 (7th Cir.1996) ("If, therefore, an expert proposes to depart from the generally accepted methodology of his field and embark upon a sea of scientific uncertainty, the court may appropriately insist that the ground his departure in demonstrable and scrupulous adherence to the scientist's creed of meticulous and objective inquiry.").

True, in his most recent filing, plaintiff asserts that apart from "Dr. Romain's methodology of relying on this scientific research," Dr. Romain based his conclusion that the trauma caused plaintiff's MS is based on "his own clinical experiences with Lennon and other MS patients, and ruling out other causes of Lennon's MS."

In his deposition, Dr. Romain also testified that he had attended many seminars with other neurologists and discussions would be had about the role that trauma may have played in the causing or exacerbation of MS.[14]

■ The fact that other MS patients may have had trauma prior to the disease's inception or exacerbation would not, in itself, carry the day. As defendant notes, a number of courts have concluded that case reports are not a scientifically reliable basis for a causation opinion. See generally, *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1316 (11th Cir.1999) (noting that "case studies pale in comparison" in the face of "population-based epidemiological studies" and that district court did not abuse its discretion by discounting expert's "reliance on case reports in the face of the overwhelming contrary epidemiological evidence presented"); *Hollander v. Sandoz Pharmaceuticals Corp.*, 95 F.Supp.2d 1230, 1235–38 (W.D.Okla.2000) (noting that "case reports have been repeatedly rejected as a scientific basis for a conclusion regarding causation") (citing *In re Breast Implant Litigation*, 11 F.Supp.2d 1217, 1228 (D.Colo.1998); *Willert v. Ortho Pharmaceutical Corp.*, 995 F.Supp. 979, 981 (D.Minn.1998)); *Pick v. American Med. Sys.*, 958 F.Supp. 1151, 1161–62 (E.D.La.1997) (noting that "courts have frequently rejected case studies as an insufficient basis to decide causation when they lack control groups" and that "the individual reports cited must be shown to be independently reliable under *Daubert* before they can be admitted"); *Haggerty v. Upjohn Co.*, 950 F.Supp. 1160, 1164 (S.D.Fla.1996) (citing *Casey v. Ohio Medical Products*, 877 F.Supp. 1380, 1385 (N.D.Cal.1995), for the proposition that "while case reports may provide anecdotal support, they are no substitute for a scientifically designed and conducted inquiry").

---

**14.** Of course, generalized statements about purported discussions regarding causation would not suffice under *Daubert* since "[a] key criterion of scientific reliability is whether a theory has been tested and subjected to peer review and publication." *Rogers v. Sec. of Health & Human Services*, 2000 WL 1337185 (Fed.Cl.2000).

*Glastetter v. Novartis Pharmaceuticals Corp.*, 107 F.Supp.2d 1015, 1029 (E.D.Mo. 2000). Such case reports are not reliable, because normally such reports "record nothing more than a temporal association between an exposure and a particular occurrence," and are therefore less reliable than epidemiological studies, because "[e]pidemiologists use their population studies to eliminate the chance associations and confounding factors, which inherently infect anecdotal reports, to determine whether a statistically significant positive association exists." *Id.* (quoting, *Wade–Greaux v. Whitehall Labs.*, 874 F.Supp. 1441, 1453 (D.Vi.1994)).

Plaintiff also suggests that Dr. Romain based his conclusion regarding the causation of plaintiff's MS upon his clinical findings and examination thereof—that is, based upon a differential diagnosis. Differential diagnoses may in fact support a finding of causation. As was explained by one court:

> Differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated. *See Baker v. Dalkon Shield Claimants Trust*, 156 F.3d 248, 252–53 (1st Cir.1998). A reliable differential diagnosis typically, though not invariably, is performed after "physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests," and generally is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely. *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 807 (3d Cir.1997) (explaining that "[d]ifferential diagnosis is defined for physicians as 'the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings' ") (quoting STED-

MAN'S MEDICAL DICTIONARY 428 (25th ed.1990)); see *McCulloch v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir.1995) (describing differential etiology as an analysis "which requires listing possible causes, then eliminating all causes but one"); *Glaser v. Thompson Med. Co.*, 32 F.3d 969, 978 (6th Cir.1994) (recognizing that differential diagnosis is "a standard diagnostic tool used by medical professionals to diagnose the most likely cause or causes of illness, injury and disease"). This technique "has widespread acceptance in the medical community, has been subject to peer review, and does not frequently lead to incorrect results." *Brown v. Southeastern Penn. Transp. Auth. (In re Paoli R.R. Yard PCB Litig.)*, 35 F.3d 717, 758 (3d Cir.1994); see *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 154–55 (3d Cir.1999) (noting "that differential diagnosis consists of a testable hypothesis, has been peer reviewed, contains standards for controlling its operation, is generally accepted, and is used outside of the judicial context" (internal quotation marks omitted)).

*Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262–63 (4th Cir.1999). The court in *Westberry* went on to note that "the overwhelming majority of the courts of appeals that have addressed the issue have held that a medical opinion on causation based upon a reliable differential diagnosis is sufficiently valid to satisfy the first prong of the Rule 702 inquiry" and to "hold that a reliable differential diagnosis provides a valid foundation for an expert opinion." *Id.*

That said, however, it must also be noted that the differential diagnosis must itself be reliable. As been aptly explained:

> Differential diagnosis is a patient-specific process of elimination that medical practitioners use to identify the "most likely" cause of a set of signs and symptoms from a list of possible causes. However, differential diagnosis does not by itself prove the cause, even for the particular patient. Nor can the technique speak to the issue of general causation. Indeed, differential diagnosis

assumes that general causation has been proven for the list of possible causes it eliminates:

> The process of differential diagnosis is undoubtedly important to the question of "specific causation." If other possible causes of an injury cannot be ruled out, or at least the possibility of their contribution to causation minimized, then the "more likely than not" threshold for proving causation may not be met. But, it is also important to recognize that a fundamental assumption underlying this method is that the final, suspected "cause" remaining after this process of elimination must actually be capable of causing the injury. That is, the expert must "rule in" the suspected cause as well as "rule out" other possible causes. And, of course, expert opinion on this issue of "general causation" must be derived from scientifically valid methodology.

*Hall v. Baxter Healthcare Corp.,* 947 F.Supp. 1387, 1413 (D.Or.1996) (quoting, *Cavallo v. Star Enterprise,* 892 F.Supp. 756, 771 (E.D.Va.1995) aff'd. on this ground, rev'd on other grounds 100 F.3d 1150 (4th Cir.1996)). After analyzing the foregoing passage, the district court in *In re Breast Implant Litigation,* 11 F.Supp.2d 1217, 1230 (D.Co.1998), held that a "[d]ifferential diagnosis may be utilized by a clinician to determine what recognized disease or symptom the patient has, but it is incapable of determining whether exposure to a substance [or in this case a harm] caused disease in the legal sense." Simply put, "an untested hypothesis cannot be a scientifically reliable basis for an opinion based on causation." *Id.*

The problem with Dr. Romain's differential diagnosis in this case stems from the fact that he has not reviewed the recent and indeed most compelling epidemiological studies which show a lack of correlation between trauma and MS.[15] While he may be generally aware of two competing schools of thought, this Court must conclude that his failure to indicate awareness of the most recent literature and most-widely recognized literature necessitates that he not be allowed to testify on the ultimate question of whether plaintiff's MS (if in fact he has that condition) was caused by the trauma to his head which occurred when he fell. To hold otherwise would be to run afoul of the notion that "The courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it." *Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 319 (7th Cir.1996).

In reaching the conclusion that Dr. Romain will not be entitled to opine that plaintiff suffered MS as a result of his fall while in the employ of defendant, this Court has applied two guiding yet sometimes competing principles—the notion that Rule 702 was intended to liberalize the introduction of relevant expert evidence with the notion that "due to the difficulty of evaluating their testimony, expert witnesses have the potential to 'be both powerful and quite misleading.'" *Westberry,* 178 F.3d at 261.

With the foregoing conclusion, defendant's motion to exclude the testimony of Dr. Romain will be granted in part and denied in part. It will be granted to the extent that Dr. Romain intended to testify that plaintiff has multiple sclerosis as a result of his fall on December 4, 1995 or that any multiple sclerosis that plaintiff has was triggered by, or exacerbated by, such a fall. Further, because the Court does not understand there to be any evidence apart from Dr. Romain's testimony which would establish any sort of causal link between plaintiff's Multiple Sclerosis and his fall at work, partial summary judgment will be granted on any claim by plaintiff that his Multiple Sclerosis was

---

**15.** Plaintiff's other expert, Dr. Schreiber, also recognizes that there are two schools of thought but points out in his deposition that he does not believe that plaintiff has MS and that, in any event, the purported relationship between trauma and the exacerbation of MS "has not been answered to my satisfaction one way or the other." (Schreiber Dep., p. 67).

precipitated by his fall at work on December 4, 1995.

### Dr. Schreiber

Dr. Schreiber is a board certified neurologist who was hired by the plaintiff as an expert in this case. Although he was not plaintiff's treating physician or treating neurologist, he examined the plaintiff, had a repeat MRI scan done, and also reviewed the medical evidence which had been generated on the plaintiff. It is his opinion that plaintiff did in fact sustain a brain injury as a result of the December 4, 1995 in the form of white matter lesions which arose as a result of the shearing forces to the brain or a diffuse axonal injury to the brain which ultimately led to demyelination:

"The cause of his neurologic problems is a fall that he had on December 4, 1995. The result of that fall is a shearing and tearing of the nervous system, the white matter producing clinical abnormalities and white matter changes on MRI."

(Schreiber Dep. p. 54). He has no reason to believe that the white matter lesions were caused by any event other than the trauma which plaintiff claimed occurred on December 4, 1995.

Unlike Dr. Romain, Dr. Schreiber does not believe that plaintiff has MS.[16] While disagreeing with Dr. Romain's assessment that plaintiff has MS, Dr. Schreiber also notes, however, that "the mechanism of injury is consistent with the opinion expressed by Dr. Romain." (Schreiber Dec. ¶ 18). It is further his opinion that plain-

tiff "has objective signs of neurological symptoms including thought disorder, memory deficits and left-sided sensory deficits." (*Id.* ¶ 19).[17]

In reaching his conclusion, Dr. Schreiber relied in part upon his own experience and also noted that he receives neurological journals regularly and has read article which generally support the notion that head trauma can lead to white matter lesions. He further noted that the text DIAGNOSTIC NEURORADIOLOGY edited by Dr. Osborn supports his conclusion. That text states in part:

Trauma is one of the most common non-vascular cause of focal white matter lesions. Diffuse axonal injury (DAI) results from axonal shearing cause by sudden acceleration-deceleration or angular rotation forces on the brain. DAI typically occurs with severe trauma, not minor injury, has a characteristic clinical presentation (immediate loss of consciousness, without an intervening "lucid interval"), and is seen on T2–weighted MR scans as multifocal hyperintensities in predictable locations. The gray-white matter interface, corpus callosum, internal capsule, and brainstem are common sites....

Dr. Schreiber also noted that a picture of an MRI in that text of a patient's brain who had suffered a head trauma showed white matter lesions in the brain similar to the lesions in present plaintiff's brain.[18]

In his deposition, Dr. Schreiber also referenced an article by Dr. Nevin. In that

---

16. Dr. Schreiber explained his reason for concluding (as does defense expert Dr. Alonzo) that plaintiff does not have MS in his deposition as follows:

... This gentleman does not fit the clinical criteria. He doesn't have relapsing remitting. He doesn't have progressive disease. He has had one episode. One episode is not multiple sclerosis.

\* \* \* \* \* \*

It was one episode. It followed his fall, and it was a deterioration of the white matter over a period of time.

\* \* \* \* \* \*

... He didn't have an episode. He didn't get real bad. He didn't get better. He

didn't get another episode in a different place. Multiple sclerosis is multiple. It's multiple abnormalities of the nervous system separated by time and space.

(Schreiber Dep. pp. 38–39).

17. Dr. Schreiber further opined that plaintiff "suffered muscle and ligament damage to the cervical spine and is suffering from post-concussion headaches due to this fall at work."

18. Dr. Schreiber admitted that he knew nothing about the patient depicted in the picture other than that the individual had suffered a closed head wound (as opposed to a penetrating injury) and that he was alive two years after the injury.

article, Dr. Nevin chronicles an investigation into the neuropathological changes in white matter in 40 head injuries:

The present investigation had two aims. First, to confirm the presence of neuropathological change in the white matter of patients dying shortly after a head injury, and second, how frequently such an alteration occurs.

In the 15 patients who died immediately following either acute myocardial infarction or pulmonary embolism, histological preparations of the white matter did not reveal any abnormality of the myelin sheaths or axis cylinders of the nerve fibers. Degeneration of the white matter, however, was present in many head injuries, and although not as marked was similar to the change observed in patients who had survived for a long time after the injury.... It is unlikely that demyelination with this distribution could be due to factors other than direct physical violence to the nerve fibers. The present observations confirm that an injury to the skull may result in diffuse lesion throughout the brain without naked eye abnormalities familiar in severe head injury. Indeed, such a lesion may play a possible role in the sudden loss of consciousness in cerebral concussion and in the numerous manifestations of the post head injury syndrome.

The second aim was to ascertain how frequently lesions of the white matter occur in head injury. Demyelination was observed in 29 of 40 consecutive head injuries. In patients who died within the first 24 hours, minor alterations in the white matter were present in more than half of the cases, while in every case which had survived longer than 7 days, degeneration was a constant finding. It would appear that diffuse damage to the nerve fiber, if looked for, is a more frequent accompaniment of head injury than has been realized in the past. Although the present cases were all fatal, it does seem probable that minor or even reversible changes in the white matter may occur in all patients who recover from a head injury.

Nevin, "Neuropathological Changes in the White Matter Following Head Injury," pp. 81–83.[19]

For its part, the defendant has presented the medical opinions of Dr. Alonso, a neurologist, and Dr. Sibley,[20] a Professor of Neurology at the University of Arizona with a clinical practice. Both have submitted declarations in response to Dr. Schreiber's assertion that the abnormalities on plaintiff's MRI scans occurred as a result of the accident at issue in this case. Both state:

With respect to the January 2, 1997 and October 11, 1999 MRI scans of Mr. Lennon's brain, I have studied the multiple irregular confluent areas of increased signal intensity—sometimes called lesions (plaques) or areas of possible demyelination. Contrary to the statements of Dr. Schreiber in his report and declaration, there is no reasonable scientific or medical basis for concluding that these areas of possible demyelination in Mr. Lennon's brain bear any causal relationship to the relatively minor trauma he experienced on December 4, 1995.

(Sibley Supp.Dec. ¶ 6; Alonso Supp.Dec. ¶ 7).[21]

---

**19.** Dr. Nevin noted that, for the most part, patients showing microscopic changes in the brain following head injury usually were severely incapacitated. He went on to note, however, "[i]t seems possible that lesser degree of white matter damage may occur in all patients with head injury, but the frequency is difficult to estimate as too few acute head injuries have been investigated histologically."

**20.** Dr. Sibley, like Dr. Romain, believes that plaintiff does in fact have MS. His belief is based upon positive findings in plaintiff's spinal fluids. (Sibley Deposition, p. 79). Unlike Dr. Romain, however, Dr. Sibley does not believe that MS is caused by trauma.

**21.** Both doctors also opine that Dr. Schreiber's diagnosis of " 'demyelination of the white matter' is vague and non-specific" and further that

Defendant also points to a study published in THE LANCET for the proposition that relatively minor head trauma as occurred here (i.e. where patient reports no loss of consciousness, there is no observable confusion and the patient has a Glascow Coma Scale of 15 [22]) does not cause shearing injury or diffuse axonal injury. The study concluded that diffuse axonal injury may result from a fall from a considerable height but that "diffuse axonal injury rarely, if ever, occurs as a result of a fall unless the patient has fallen some distance" and that "[d]iffuse axonal injury found post mortem is not likely to have occurred as a result of a simple fall." (THE LANCET, No. 8417/8 p. 1421 (1984)).

There seems to be no doubt but that plaintiff's MRI scans show irregularities in the white matter of his brain. This Court's studied review of the record in this cause leads it to conclude that head trauma can in fact cause shearing and lead to demyelination of the white matter in the brain.

Indeed, a fair reading of the evidence cited by the defendant to the Court suggests that trauma can result in shearing or diffuse axonal injury. Both Drs. Sibley and Alonzo allude to that possibility by suggesting that there is no basis for con-

cluding that the "areas of possible demyelination" are causally related to the "*relatively minor* trauma he experienced on December 4, 1995" with the clear inference being that major trauma may lead to such demyelination.

More specifically, Dr. Sibley concedes as much in his deposition. Dr. Sibley, after testifying that he believed that the configuration of the lesions, coupled with positive results from plaintiff's spinal fluids suggested that the lesions in this case are not of the type which would occur from trauma,[23] testified in his deposition:

Q. ... I will restate the question as to whether you would agree or disagree with the literature that reports the existence of demyelinating lesions in the white matter as having been caused by some degree of conclusive head trauma. You're saying that that is not a finding that will show up in the real world?
A. I'm saying it didn't happen in Mr. Lennon's case because of the very mild nature of the head trauma.
Q. Okay. That's what I'm trying to get to. This opinion, he doesn't have demyelinating lesions from this trauma is due to the degree of trauma?
A. That's my opinion.

(Sibley Dep. p. 78).[24] Later in response to

---

Whether alleged to be 'multiple sclerosis' or 'demyelination of the white matter,' my opinions and conclusions are the same—including those set forth in my original declaration and report in this matter: There is no reliable scientific or medical basis for concluding that such irregularities (plaques, lesions or areas of demyelination, whether it is MS or not) were in any way related to or caused by the relatively minor injury he sustained on December 4, 1995. (Sibley Supp.Dec. ¶ 7; Alonso Supp.Dec. ¶ 6).

22. The Glascow Coma Scale assesses impaired consciousness by scoring monitored performance in three areas: eye opening, verbal performance, and motor responsiveness. The "best" possible score is 15 with 4 points for spontaneous eye opening + 5 points for coherent verbal performance + 6 points for following instructions relating to motor responsiveness. At the other end of the scale would be 3 points where a patient does not open his or her eyes (1 point), has no verbal

reaction (1 point) and no motor responsiveness (1 point). See, Stedman's *Medical Dictionary,* p. 1596 (27th ed.2000).

23. Dr. Sibley noted that lesions from diffuse axonal injury are different than lesions in MS patients. Patients who have experienced a DAI

"develop lesions preferentially at the cortical—subcortical junction in the corpus callosum and brainstem. These are lesions which have no resemblance whatsoever to multiple sclerosis. They're axonal disruptions, that is, disruptions of the nerve fibers which retract into a little ball, and it's quite a distinctive type of pathology...."
(Sibley dep. pp. 83–84).

24. Plaintiff's trauma was viewed by Dr. Sibley to be mild because he was alert after the accident and able to drive himself to the hospital and there was no report that he had lost consciousness.

questioning from defense counsel, Dr. Sibley flat-out states that diffuse axonal injury can occur to "people who have had very severe head injuries. It does not occur with minor head injuries." (Id. p. 84).[25]

Apart from that testimony, the article in THE LANCET supports the notion that falls can lead to diffuse axonal injury. Indeed, the article specifically states that "there was a statistically significant association between the presence of diffuse axonal injury and falls from a considerable height." (The Lancet, No. 8417/8 p. 1420 (1984)).

■ Rather than there being no correlation between a fall and diffuse axonal injury and/or shearing injury, it seems clear that the real question is really one of degree. Defendant would have this Court hold, as a matter of law (or medicine), that the fall that occurred in this case was not significant enough to cause such injury in that it was in its view relatively minor. This the Court will not do for several reasons.

First, it does not appear that minor head injuries cannot, in any case, cause diffuse axonal injury. The literature presented to the Court alone would not support such a conclusion. For example, Dr. Nervine's article (excerpted above) states that while his study related to fatal injuries, "it does seem probable that minor or even reversible changes in the white matter may occur in all patients who recover from a head injury." Further, while THE LANCET indicates that "diffuse axonal injury rarely, if ever, occurs as a result of a fall unless the patient has fallen some distance" and that "[d]iffuse axonal injury found post mortem is not likely to occur as a result of a simple fall," this does not meant that that can not occur.

Second, it cannot be taken as a given that the fall in this instance was a simple fall. While Dr. Schreiber candidly admits that he was not at the accident scene, his review of the pictures of plaintiff and the description of the fall would probably be deemed "sudden deceleration, 'cause his head was stopped by the concrete.'" (Schreiber Dep. P. 22). Moreover, the pictures of plaintiff suggest that the blow was not directly to the front, but rather "somewhat off to one side. So it may have caused some rotational forces as well." (Id).[26] He deems the fall severe because of the "residual", i.e. the nature of his injury.

In reaching this conclusion, this Court is not unmindful of defendant's argument that Dr. Schreiber, as noted in the following exchange, cannot point to any studies which involved a fall quite like that which occurred in this case which would support the notion that the injury in this case could result from such a fall:

Q. Can you identify any specific scientific study which supports the conclusion that white matter lesions or plaques are caused by trauma after which the patient reports no loss of consciousness, there is no observable confusion, no observable impaired consciousness and there is a Glascow Coma Scale score of 15?

A. I know of no study that fits all of those criteria. I think there are studies that show that there are significant abnormalities following significant head trauma with cerebral deficits and white matter lesions.

(Schreiber Dep. p. 72).

In this Court's view, to require a physician to point to so specific a test would be to defeat the general purpose behind *Daubert* which is to prevent the jury from being persuaded by something which can only be deemed to be junk science. True,

25. Dr. Sibley also testified that plaintiff's MRI scans do not suggest DAS but rather MS lesions.

26. In his deposition, Dr. Schreiber's said that the picture of plaintiff's forehead looked like he had an "ostrich egg" sized bump on his head this indicated to him that plaintiff had a "huge forehead injury" because "he fell and really slammed his head." (Schreiber Dep. p. 98).

Dr. Schreiber's correlation between the fall in this case and the subsequent demyelination of the white matter in plaintiff's brain could be viewed by some to be "shaky." *Daubert* teaches, however, that "shaky but admissible" evidence is to be tested the traditional way—by "cross-examination, presentation of contrary evidence, and careful instructions on the burden of proof." *Daubert,* 509 U.S. at 588–89, 113 S.Ct. 2786. *See also, Harvey v. Rines,* 1999 WL 33117105 (D.Me.1999) ("too narrow a view of the *Daubert* standard" where defendant asserted that in order for plaintiffs' experts to offer an opinion that opinion must be supported with studies specific to the drug that induced status epilepticus rather than status epilepticus induced by drug overdose in general) citing, *Mendes–Silva v. United States,* 980 F.2d 1482, 1486 (D.C.Cir.1993) (study exactly duplicating conditions at issue in case at hand not necessary in order for expert to express opinion on causation; applying stricter pre-*Daubert* standard); *Wilson v. Petroleum Wholesale, Inc.,* 904 F.Supp. 1188, 1190–91 (D.Colo.1995) (lack of scientific studies on specific issue on which expert stated opinion was matter for cross-examination rather than exclusion of opinion testimony; applying *Daubert* ).

The Court is also fully aware, as defendant points out, that Dr. Schreiber was of the view that plaintiff lost consciousness for at least a moment but that there was no evidence in the record which would support that conclusion based upon what plaintiff told the emergency room physicians.[27] Dr Schreiber opined, however, that whether plaintiff lost consciousness would not alter his opinion given his review. It is his opinion that whether a patient loses consciousness or not is not the key point. Rather, it "the vectors of force that are applied upon the brain." Dr. Schreiber further noted that he has seen patients who have had "penetrating head injuries of what would appear to be of a sever degree" but turn out to have very little residual effect. On the other hand he has "seen patients who have had what appear to be minor head injures and end up being dead."

This Court cannot conclude as a legal matter that such could not be a valid scientific opinion. After all, "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact. . . ." *See Daubert,* 509 U.S. at 595, 113 S.Ct. 2786 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."); *Walker,* 208 F.3d at 587 (stating that when addressing whether expert testimony is reliable the district court should not consider the "factual underpinnings" of the testimony but should determine whether "[i]t was appropriate for [the expert] to rely on the test that he administered and upon the sources of information which he employed"). *Smith v. Ford Motor Co.,* 215 F.3d 713, 715 (7th Cir.2000).

In conclusion, Dr. Schreiber will be allowed to testify. Whether his opinion is correct is, of course, not for the court to decide, *see, id.* at 715 and whether his opinion is believed is for the jury to decide.

### Conclusion

In light of the foregoing, the "Motion to Exclude the Testimony of Dr. Louis Ro-

---

**27.** A CAT scan taken of plaintiff at the emergency room on the evening of the injury was negative. Dr. Schreiber noted that a CAT scan will not pick up demyelination, only large amounts of blood or fractures. Moreover, demyelination would not occur immediately even though there were sheering forces. As Dr. Schreiber explained in his deposition . . . The shearing force occurs, the tissue gets damaged. You can have blood forming, little petechial hemorrhages that cause disruption of the tissue. You can have tissue damaged and then inflammation. And therefore, it then demyelination, loss of the myelin sheath. Those forces occur and over the course of time you have invasion of the cells called glia. They're kind of like the white cells of the brain, and they come in, and they take away the tissue, and that tissue then leaves you with a hole, and that hole show up as the changes on the MRI. (Schreiber Dep. P. 28).

main," which was filed on October 18, 1999, is GRANTED IN PART AND DENIED IN PART. That motion is GRANTED insofar as defendant is seeking to preclude Dr. Romain from testifying concerning the alleged cause of the onset of plaintiff's Multiple Sclerosis and from testifying that the Multiple Sclerosis was precipitated by the trauma to plaintiff's head which occurred on December 4, 1995 but in all other respects is DENIED. There being no other competent evidence which would support the notion Multiple Sclerosis can be caused by the type of fall which occurred in this case, defendant's October 18, 1999 motion for partial summary judgment is GRANTED with respect to any claim plaintiff has that his multiple sclerosis was precipitated by his slip and fall at work on December 4, 1995. The "Motion to Exclude or Limit the Testimony of Dr. David Schreiber" filed by defendant on December 13, 1999 is DENIED.