OWENS, Jo, As Personal Representative of the Estate of Randy Owens, Deceased, Owens, Jo, as Personal Representative of the Estate of Randy Owens, Deceased, Plaintiffs,

v.

FORD MOTOR COMPANY, Unknown Manufacturer of Air Bag, Unknown Designer of Air Bag, Defendants.

No. NA 01–164–C H/H.

United States District Court,
S.D. Indiana,
New Albany Division.

Sept. 23, 2003.

ment" and the amount due is undisputed,

Jackson is entitled to prejudgment interest.

Jay D. Allen, Allen Allen & Allen, Salem, IN, Michael L. Einterz, Indianapolis, IN, for Plaintiffs.

Nicholas Pappas, Locke Reynolds LLP, Indianapolis, IN, for Defendants.

## ENTRY ON DEFENDANT'S RULE 702 CHALLENGE AND MOTION FOR SUMMARY JUDGMENT

HAMILTON, District Judge.

Plaintiff Jo Owens, individually and as personal representative of the estate of her late husband Randy Owens, has sued defendant Ford Motor Company in diversity alleging a defect in the manufacture of the air bag in plaintiff's 1991 Ford Taurus GL. This defect, Mrs. Owens claims, caused the air bag to fail to deploy completely in an accident, causing additional injury to Mr. Owens and perhaps even contributing to his later death. Ford has moved to exclude plaintiff's proffered expert witnesses, challenging both their qualifications and the reliability of their opinions. On the basis of this challenge, Ford has further moved for summary judgment. As explained below, plaintiff has not come forward with expert opinions founded on sufficient facts or data, or derived from reliable principles or methods, to show that the air bag failed to deploy properly in the Owens accident. Without admissible expert testimony on that key point, plaintiff cannot present a genuine issue of material fact as to whether Ford's product was defective. Accordingly, Ford's motion for summary judgment must be granted.

### Summary Judgment Standard

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment is appropriate when there are no genuine issues of material fact, leaving the moving party entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). On a motion for summary judgment, the moving party must first come forward and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which the party believes demonstrate the absence of a genuine issue of material fact. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Where the moving party has met the threshold burden of supporting the motion, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Local Rule 56.1 requires the party opposing a motion

for summary judgment to identify specific and material factual disputes. The non-moving party "may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits." *Chemsource, Inc. v. Hub Group, Inc.,* 106 F.3d 1358, 1361 (7th Cir.1997).

■ In reviewing the parties' submissions, the court must consider the evidence in the light most favorable to the non-moving party. However, the existence of some metaphysical doubt does not create a genuine issue of fact. "A party must present more than mere speculation or conjecture to defeat a summary judgment motion." *Sybron Transition Corp. v. Security Ins. Co. of Hartford,* 107 F.3d 1250, 1254 (7th Cir.1997). The issue is whether a trier of fact could reasonably find for the party opposing the motion with respect to the particular issue. The court should neither "look the other way" to ignore genuine issues of material fact, nor "strain to find" material factual issues where there are none. *Mechnig v. Sears, Roebuck & Co.,* 864 F.2d 1359, 1363–64 (7th Cir.1988). Where expert opinions are employed to oppose summary judgment, the proffered opinions must be "admissible or usable at trial." *Smith v. City of Chicago,* 242 F.3d 737, 741 (7th Cir.2001).

## Factual Background

On June 2, 1999, Randy Owens was driving his 1991 Ford Taurus GL on State Road 111 near New Albany, Indiana. His wife Jo Owens was in the passenger seat. The Owens' car collided with a car that had pulled into their path from a side road.

The damage to the Owens' Taurus was extensive and "totaled" the car. The windshield had an impact fracture on the driver side. Also on the driver side, the knee bolster was significantly caved in and the sun visor vanity mirror was cracked. Photographs of the car taken immediately after the accident show that the driver-side air bag mounted in the steering wheel had deployed. The extent of the deployment—which is the primary issue in this case—cannot be judged from the photos. A safety feature built into all air bags causes them to deflate after deployment in a collision. The upper rim of the steering wheel itself was also bent.

After the accident, Mr. Owens was taken to a hospital emergency room where he complained of pain to his back, knee, forehead and cervical spine. Bessen Dep. at 15. He was diagnosed with a mild concussion, multiple contusions, abrasions, and a lumbar sprain. *Id.* at 14. No mention was made at the hospital of any chest pain or trauma. He was treated and released later the same day.

About seven months later, on January 25, 2000, Mr. Owens underwent a routine electrocardiogram (EKG) in preparation for orthopedic surgery. The EKG and subsequent testing revealed that Mr. Owens had severe heart disease and had suffered a heart attack at some previous time. Mr. Owens indicated to the consulting cardiologist that he had suffered chest trauma from impact with the steering wheel in the June accident and complained that he had been feeling chest discomfort ever since. Mr. Owens' medical history showed that he was a smoker and had borderline hypertension. Bypass surgery and a cardiac catheterization were recommended and performed.

Mr. and Mrs. Owens filed this action on May 31, 2001 in the Superior Court of Washington County, Indiana. Defendant Ford then removed the case to this court. Despite surgery and medication, Mr. Owens' condition deteriorated. He complained of continuing chest pain, fatigue, and depression, and he was diagnosed with congestive heart failure. More than three

years after the accident, on June 25, 2002, Mr. Owens died. In October 2002, Mrs. Owens was substituted as plaintiff in her capacity as representative of Mr. Owens' estate. Other facts are noted below, keeping mind the standard that applies on summary judgment.

### Discussion

#### I. Applicable Legal Standards

Plaintiff's theory of the case is that the Taurus air bag had a manufacturing defect that prevented the completion of the chemical reaction needed to fully inflate the air bag. Thus, when Mr. Owens was thrown forward by the force of the collision, according to plaintiff, the partially inflated air bag did not properly cushion his chest's impact with the steering wheel, which proximately caused his heart attack and eventual death. Plaintiff offers three expert witnesses to support the different steps of this theory. Plaintiff's case is built on the assumption that the air bag failed to deploy completely, but plaintiff cannot support that assumption with reliable, admissible expert testimony.

■ To establish a claim for strict product liability under Indiana law a plaintiff must show: (1) the product was defective; (2) as a result of the defect, the product was unreasonably dangerous; (3) the defect existed when the product left the con- trol of the defendant and reached the plaintiff without substantial alteration; (4) plaintiff was injured; and (5) plaintiff's injury was proximately caused by the product. Ind.Code § 34–20–2–1. Ford concentrates its attack on the first element, contending that plaintiff has not raised a triable question as to whether the air bag was defective.[1]

■ "Expert testimony is not always required to establish an element of a products liability action if there is sufficient circumstantial evidence within a lay person's understanding that would constitute a basis for a legal inference and not mere speculation." *Cansler v. Mills*, 765 N.E.2d 698, 706 (Ind.App.2002), citing *U–Haul Int'l, Inc. v. Nulls Mach. & Mfg. Shop*, 736 N.E.2d 271, 285 n. 3 (Ind.App.2000). In *Cansler*, for example, the Court of Appeals found that expert testimony was not needed to find a manufacturing defect in an air bag that failed to deploy where the evidence indicated that the car was traveling 45 to 50 miles per hour at the moment of impact, the impact bent the car's frame, and the air bag was designed to deploy in frontal collisions at speeds greater than nine to fifteen miles per hour.

■ Where the existence of a defect depends on matters beyond the common

---

1. The court's decision focuses on plaintiff's first two experts, Dr. Robert Pribush and Jim Casassa, who have been offered to prove the existence of the manufacturing defect. Plaintiff offered a third expert, Dr. Matthew Bessen, to prove that the alleged manufacturing defect proximately caused Mr. Owens' heart attack and subsequent death. Because Ford is entitled to summary judgment as to liability, the court need not discuss in detail Dr. Bessen's opinion regarding the effects of the alleged defect. However, Dr. Bessen's deposition testimony shows that the supposed causal connection between Mr. Owens' heart problems and the accident (let alone the alleged failure of the air bag to deploy com- pletely) is based on no more than an educated guess or hunch. See Bessen Dep. at 19, 41, 53 (Dr. Bessen unwilling to testify to a reasonable degree of medical certainty that accident caused heart condition and eventual death; accident was "just a possibility" as cause of heart condition; Dr. Bessen had no opinion about whether alleged failure of air bag to deploy fully contributed to heart condition); see also *Daub v. Daub*, 629 N.E.2d 873, 877 (Ind.App.1994) (evidence of medical causation that establishes a mere possibility of cause or lacks reasonable certainty or probability is not sufficient evidence by itself to support a verdict).

understanding of a lay juror, however, admissible expert testimony is required to sustain the plaintiff's burden of proof on the question. See *Cansler*, 765 N.E.2d at 706; *U–Haul*, 736 N.E.2d at 284–85 (affirming summary judgment in manufacturing defect case; expert witnesses presented genuine issues as to whether brake valve on trailer was defective and whether defect caused leak, but no admissible expert opinion supported a finding that the alleged defect proximately caused the accident).

In this case, the pivotal question is whether the air bag deployed completely, so as to provide the full intended cushioning effect in the Owens' accident. There is no direct evidence that the air bag failed to deploy completely. Whether the circumstantial evidence from the accident—such as the condition of the air bag mechanism, damage to the interior of the car, and injuries to Mr. Owens—would support a finding that the air bag failed to deploy completely is a question beyond the common understanding and everyday experience of lay jurors. One would need to be familiar with the expected condition of the air bag mechanism after complete deployment, and with the expected interior damage and injuries based on the mechanics of the accident, determined from such information as the vehicles' velocities, their designs for absorbing energy in collisions, and Mr. Owens' position and weight. As a result, plaintiff needs admissible expert testimony to support a finding that the air bag failed to deploy completely. See, *e.g.*, *Porter v. Whitehall Labs., Inc.*, 791 F.Supp. 1335, 1342 (S.D.Ind.1992) (expert testimony needed to prove alleged causal connection between ibuprofen and renal disease because issue was not within understanding of lay jury), *aff'd*, 9 F.3d 607 (7th Cir.1993) (agreeing that expert testimony was essential to prove causation).[2]

On a motion for summary judgment, the court may consider expert testimony only if it would be admissible at trial. *Smith*, 242 F.3d at 741. The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence and the guiding principles declared in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Therefore, if the testimony of Dr. Pribush and Casassa does not pass muster under Rule 702 to support a finding that the air

---

**2.** In a case alleging design defect in an air bag, a plaintiff would need a qualified expert witness to show that an alternative design would be feasible and less dangerous than the design of the defendant's product. See, *e.g.*, *Quintana–Ruiz v. Hyundai Motor Corp.*, 303 F.3d 62, 77 (1st Cir.2002) (expert testimony required to show design defect in air bag because air bag deployment is "not part of the 'everyday experience' of the consuming public"); *Wood v. Toyota Motor Corp.*, 134 Md. App. 512, 760 A.2d 315, 318 (2000) (expert testimony required in air bag design defect case because issues "are outside the realm of lay juror's understanding"); see generally *Pries v. Honda Motor Co.*, 31 F.3d 543, 546 (7th Cir.1994) (required proof for design defect under Indiana law). In manufacturing defect cases, expert evidence is not always required. For example, where air bags failed to deploy at all in relatively high speed collisions, courts have found that juries could infer the existence of a defect without expert testimony on the point. See *Cansler v. Mills*, 765 N.E.2d at 706–07 (reversing summary judgment in such a case under Indiana law); *Silvestri v. General Motors Corp.*, 210 F.3d 240, 245 (4th Cir.2000) (under New York law in case alleging manufacturing defect in air bag, jury could infer a defect without expert testimony based on evidence: (1) that the air bag was intended to deploy in a frontal crash with a barrier at a speed of 9–15 mph, (2) that crash with utility pole was equivalent to a barrier crash at a speed of 24 mph, (3) that air bag did not deploy at all, (4) that plaintiff's enhanced injuries were not caused by factors other than the non-deployment of the air bag itself, and (5) that there was no evidence of prior tampering or misuse of the air bag).

bag failed to deploy completely, Ford is entitled to summary judgment.

 Rule 702 imposes five requirements on proffered expert testimony: (1) the witness must be qualified as an expert by knowledge, skill, experience, training, or education; (2) the offered testimony or opinion must be based upon sufficient facts or data; (3) the offered testimony or opinion must be derived from reliable principles and methods; (4) the expert witness must have applied the principles and methods reliably to the facts of the case; and (5) expert or specialized knowledge must be helpful in assisting the trier of fact to understand the evidence or to determine a fact in issue. Rule 702 gives trial courts a "gatekeeping role" to ensure that expert opinions presented to a jury are based on an adequate factual foundation and are the product of reliable methodology. See *Daubert*, 509 U.S. at 597, 113 S.Ct. 2786. Ford argues that the opinions of Dr. Pribush and Casassa fail all five of Rule 702's requirements. The court need consider only the "facts" and "methods" elements to resolve the question at hand.

## II. *Dr. Robert A. Pribush*

Dr. Pribush holds a Ph.D. in chemistry from the University of Massachusetts and a B.S. in chemistry from the University of Delaware. Since 1986 he has taught as a Professor of Chemistry at Butler University in Indianapolis. Dr. Pribush has no experience in the design, manufacture or maintenance of air bags, although he has participated in two past air bag lawsuits focusing on the chemical reactions that take place during air bag deployment.

 Deployment of an air bag is initiated by an impact sufficient to trigger two or more sensors located throughout the car. Once triggered, the sensors in turn spark a chemical reaction resulting in the rapid decomposition of sodium azide. As the sodium azide decomposes, nitrogen gas is produced, thereby inflating the air bag. The entire sequence of events, from impact to inflation, occurs within milliseconds.

Dr. Pribush opined that *if* the Taurus' air bag did not fully inflate, the likely cause was the failure of the sodium azide to completely decompose, which resulted in the production of insufficient nitrogen gas. Pribush Dep. at 12. Dr. Pribush testified plainly, however, that he had no opinion as to the critical question: whether the air bag did or did not fully inflate. Instead, for purposes of his analysis, Dr. Pribush *assumed* that the air bag did not fully deploy.

Q: Given your testimony that you have no idea of the quantity of azide in the samples that you tested, how can you know if the incomplete decomposition of the sodium azide resulted in less nitrogen gas being generated than would be necessary to fully inflate the bag?

A: Okay. What I'm saying is that I have been told that an air bag did not fully deploy.

Q: So you're assuming that.

A: I'm assuming that. I'm observing materials on the outside of the canister that I've never observed before that contain azide, so I know there is unreacted azide ...

Q: You have been told that the air bag did not fully deploy. That's what you said. So that's not a part of your opinion.

A: It's not—it's not a part of my opinion to determine whether it did or did not. I mean, I'm assuming that it did not.

*Id.* at 37–38.

Dr. Pribush's opinion that the sodium azide reaction was incomplete is based on

his finding of unreacted azide remnants in some solid material on the interior and exterior of the air bag canister. He made this finding by using a "spot test" derived from the scientific literature. According to Dr. Pribush, this method was envisioned as a "very quick test," one that was designed merely to confirm the presence or absence of unreacted azide qualitatively, but which was incapable of measuring the amount of remaining azide in the solid material. *Id.* at 13. Though Dr. Pribush recommended that an ion chromatography test be done to quantify the amount of unreacted azide, plaintiff's attorneys did not authorize him to perform that test.

Dr. Pribush's lack of knowledge regarding the quantity of unreacted azide did not prevent him from forming the opinion that the chemical reaction necessary to produce nitrogen gas was incomplete. That opinion is not sufficiently reliable to be admissible. He based this opinion on his observation of solid material (containing an unspecified quantity of azide) arranged asymmetrically on the exterior of the spent air bag canister. Based on his experience and a letter from defendant's counsel relaying Ford's technical specification for post-deployment azide gas, Dr. Pribush has opined that the material was abnormal and was consistent with an incomplete chemical reaction within the air bag. *Id.* at 31–33.[3]

The problem is that there is no reliable basis for Dr. Pribush's opinion that the chemical reaction was incomplete because he never performed any quantitative tests.

The spot test that he performed could test positive even if only trace amounts of azide were present in the solid material on the canister. The result of Dr. Pribush's spot test would have been the same, for example, whether one milligram or 50 grams remained in the canister.

Plaintiff's brief seriously mischaracterizes the evidence with respect to the remaining sodium azide. The brief states that Dr. Pribush discovered unreacted sodium azide "in more than negligible quantities" and that the quantity discovered was "greater" than the "trace" amounts provided for by Ford's technical specification. Pl. Br. at 5–6. If Dr. Pribush had actually testified to those points, there might be more room for debate here. Dr. Pribush's testimony, however, flatly contradicts the brief's view of the evidence. No test Dr. Pribush conducted was able to quantify the amount of unreacted sodium azide to any degree, much less to find that it was present "in more than negligible quantities." See Pribush Dep. at 13–15. In fact, Dr. Pribush's inability to quantify the remaining azide was primarily the result of counsel's refusal to authorize the appropriate test. *Id.* at 14. Yet plaintiff's counsel now claim that Dr. Pribush testified to the very proposition that he testified he could *not* support without further testing.[4]

Plaintiff also has not presented any evidence regarding the quantity of unreacted azide in non-gaseous form that one would normally expect to find after a complete

---

3. The document containing Ford's technical specification is not in the record, although a portion of it was read during Dr. Pribush's deposition. See Pribush Dep. at 30. The specification states that the amount of sodium azide in the gas used to inflate the bag should be less than 0.15 milligrams per cubic meter, measured after deployment. *Id.*

4. The only quantitative evidence in the record comes from Ford's expert witness on this point, who testified that more than 99.99 percent of the sodium azide originally in the Owens' air bag was consumed in the reaction to generate gas to deploy the air bag. Blomquist Aff. ¶ 3. Plaintiff has not offered any contrary evidence or challenged the reliability or accuracy of Blomquist's finding.

and successful air bag deployment. Dr. Pribush's reading of Ford's technical specification regarding post-deployment azide gas is simply inapplicable. The standard was calculated by deploying an air bag inside a closed tank and then drawing the excess gasses out of the tank for analysis. *Id.* at 30. The presence or absence of *solid* material post-deployment is beyond the scope of the specification. Nothing in the record justifies the inference that the mere presence of an indeterminate amount of azide post-deployment shows a defective and incomplete chemical reaction.

Dr. Pribush opined that the presence of solid material on the canister is itself evidence of an incomplete reaction, regardless of quantity. The factual context necessary to give this finding any meaning is absent. Dr. Pribush testified that the discharge seemed abnormal in his experience, but his basis for comparison is extremely small. He had previously examined only two other air bag canisters. Without quantitative information, there is no reliable basis for his opinion regarding the abnormality of the solid material on the air bag canister.

 The fact that Dr. Pribush assumed the very thing he was to prove renders his opinion conditional at best and tautological at worst. "Simply put, an expert does not assist the trier of fact in determining whether a product failed if he starts his analysis based upon the assumption that the product failed (the very question that he was called upon to resolve)." *Clark v. Takata Corp.,* 192 F.3d 750, 757 (7th Cir.1999). In either case, the underlying facts and data cited by Dr. Pribush are not sufficient to support a finding that the air bag failed to inflate fully in the Owens' accident.

### III. *James Casassa*

Casassa holds a bachelor's degree in mechanical engineering and a master's degree in industrial administration, both from Purdue University. Since 1989 he has been employed by Wolf Technical Services as an accident investigator and reconstructionist. In this capacity, Casassa has investigated over 500 vehicle accidents. His knowledge of air bags is drawn from self-study, attending technical seminars on the topic, and previous accident investigations he has conducted. Casassa estimates that he has examined over 100 different air bag systems, though he is unable to say for certain whether the 1991 Taurus air bag is among those. Casassa Dep. at 72.

In Casassa's opinion, the Owens air bag was defectively manufactured. *Id.* at 58. In forming this opinion, he relied on three principal sources. First, Casassa relied on what he believed was the opinion of Dr. Pribush that the chemical reaction necessary to inflate the air bag was not complete.

Second, Casassa based his opinion on his own conclusion that there was greater than normal excess material left on the Owens air bag inflator after deployment. This conclusion was based on his general experience observing other air bag systems, and also on a specific comparison of the Owens inflator to another inflator removed from a junked 1991 Ford Taurus. *Id.* at 71–72. Casassa recommended that six to ten further comparisons be conducted, but he was never authorized to do so.

Finally, Casassa also based his opinion that there was a manufacturing defect on his examination of the damage to the inside of the Owens vehicle. Casassa observed that the windshield, steering wheel and vanity mirror all demonstrated evidence of occupant contact during the accident. These observations, however, were made some time after the accident, at a scrap yard where the Owens Taurus had repeatedly been handled and punctured by

a forklift, and where it had been stored with another wrecked car on top of it. *Id.* at 36–37. Casassa did examine photos taken of the car immediately after the accident, but he was unable to tell from the pictures whether the windshield fracture resulted from an internal force (such as occupant contact) or an external one. *Id.* at 38. Casassa also admitted that the deformed steering wheel was not by itself indicative of incomplete air bag deployment. *Id.* at 36. Other than taking measurements of the car, Casassa performed no accident reconstruction or kinematic tests (tests measuring the motion of bodies within a car during a crash) to confirm the possibility or degree of occupant contact. Further, neither his investigation nor any published study of which he is aware supports the finding that occupant contact with the windshield is necessarily inconsistent with a properly functioning air bag.

Casassa's opinions suffer from deficiencies similar to those of Dr. Pribush. First, the primary foundation of Casassa's opinion that the air bag did not fully inflate is Dr. Pribush's unreliable and inadmissible opinion regarding the significance of the unreacted azide:

Q: What was the manufacturing defect?

A: That would be a chemical question. It appears that for some reason the reaction didn't go forward to completion.

Q: Well, you said you had the opinion that there was a manufacturing defect, so tell me the basis for that opinion.

A: It is that the reaction did not go forward to completion.

Q: And you would rely on Dr. Pribush for the accuracy of that opinion, correct?

A: Yes. I'm relying on his opinion that there was unreacted propellant left . . . in the aftermath of the collision. *Id.* at 58. Although a testifying expert may rely on another expert's opinion, the testifying expert's opinion should be rejected if the underlying basis is unreliable. *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 588 (7th Cir.2000). To the extent that Casassa's opinion depends on the opinion of Dr. Pribush, it is also inadmissible.

Casassa's opinion regarding the abnormality of the solid material found on the air bag inflator is also not admissible or a reliable foundation for any other conclusions. First, like Dr. Pribush's observations, Casassa's opinion is devoid of quantitative information about the amount of azide in the material. Second, Casassa's limited experience with air bag systems did not provide an adequate basis for him to judge whether the supposedly excess material was aberrant. By his own admission, Casassa has witnessed the deployment of an air bag only "once or twice." Casassa Dep. at 52. Also, the single comparison he conducted, between the Owens inflator and the inflator of another vehicle, does not constitute the rigorous and "scientifically valid" methodology that *Daubert* demands. See 509 U.S. at 593, 113 S.Ct. 2786. Casassa himself recognized this, testifying that he would need a sample of six to ten deployed Taurus air bags to demonstrate by comparison that the presence of the solid material was unusual. Casassa Dep. at 73–74.

Finally, Casassa cited his examination of the interior of the Taurus as a ground for his conclusion, but this basis also fails to satisfy Rule 702. *Daubert* established a flexible framework within which the scientific validity of an expert's methodology could be tested, and this analysis has been expanded to cover the evaluation of technical as well as scientific expertise. See

*Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The *Daubert* Court identified several factors that lower courts may consider in assessing an expert's methods: (1) whether the expert's theory can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the technique; and (4) the technique's general acceptance among the relevant scientific or technical community. 509 U.S. at 593–94, 113 S.Ct. 2786. The goal of these factors is to filter out "subjective belief or unsupported speculation." *Chapman v. Maytag Corp.,* 297 F.3d 682, 687 (7th Cir.2002).

Casassa opined that Mr. Owens struck the lower instrument panel as a result of the crash, but he admitted that he neither performed nor reviewed any tests that would support that opinion. Casassa Dep. at 32. Further, he acknowledged that it would be possible to test his opinion by conducting measurements of occupant positioning and by reviewing crash test data, such as Mr. Owens' weight and the speed of the collision. Casassa never collected or analyzed this data. *Id.* at 33.

Casassa also believed that the deformed steering wheel resulted from Mr. Owens contacting it with his chest during the crash. However, Casassa again performed no tests to confirm this hypothesis. Also, he acknowledged that the bent steering wheel does not show incomplete air bag deployment:

Q: My question is, would the extent of ... the deformation be different if the air bag fully deployed compared to if it did not fully deploy ...?

A: Well, I think the answer is that even in cases where the air bag deploys as expected, you can still have some deformation of the steering wheel rim.

Q: So that fact alone, the deformation of the steering wheel rim, really doesn't give us much insight one way or another as to whether the air bag fully deployed or no?

A: Standing by itself, no.

*Id.* at 35–36. Casassa's theory that Mr. Owens struck the windshield is similarly untested, *id.* at 42, and relies on incomplete data. Further, he neither reviewed nor is aware of any study addressing the likelihood of occupant-windshield contact with full air bag deployment.

■ The extent of Casassa's investigation seems to have been a visual inspection of the junked car and some preliminary measurements of the driver's seat position. Based on this data, Casassa claimed that his experience told him that Mr. Owens violently contacted the interior of the car, and that this contact was the product of an incomplete air bag deployment. *Id.* at 6–7. It is true that the *Daubert* test contemplates permissible "experience-based" testimony, but whether an expert's opinion is based on scientific studies or personal experience, he still must employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire,* 526 U.S. at 148–152, 119 S.Ct. 1167; see also *Chapman,* 297 F.3d at 688 ("personal observation is not a substitute for scientific methodology and is insufficient to satisfy *Daubert's* most significant guidepost"). Casassa's own testimony demonstrates that his investigation of the Owens crash fell short of generally accepted industry standards:

Q: Did you reconstruct the accident?

A: No.

Q: And that is something you do as part of your job as a consultant with Wolf Tech; right?

A: That's one of the things I do, yes.

Q: In fact, you do that quite frequently, don't you?

A: Yes.

Q: You've reconstructed hundreds of accidents?

A: Yes.

Q: Did you attempt to determine the occupant kinematics of Mr. Owens?

A: Only to the extent that I documented what I thought were the points of contact with the interior of the vehicle

Q: And that was based solely on the damage you noted in the vehicle that we talked about earlier?

A: Yes. I didn't do any computer simulation of kinematics or anything in this case.

Q: And in order to really determine kinematics, you would have to have a reconstruction of the accident, wouldn't you?

A: That would be one of the items you would have to have, yes.

Q: What else would you have to have?

A: You'd obviously have to know whether there was any preimpact breaking, what his seating position was. You'd have to know some more information about basically how tightly he clinched his belt down and how much ... extra covering he had on his pelvis.

Q: And do you have any of that information?

A: No.

Casassa Dep. at 81–82. Plainly, the methodology underlying Casassa's opinion that the air bag failed to fully inflate does not display the same "intellectual rigor" of experts in the accident investigation field. This deficiency in methodology and his reliance on Dr. Pribush's similarly inadmissible opinion undermine the reliability

and therefore the admissibility of his conclusions.

### Conclusion

 The court's role on summary judgment is not to choose the better expert but to ensure that all experts satisfy the requirements of Rule 702. Where a proffered expert's testimony rests on insufficient data and unreliable methodology, those requirements are not met. Accordingly, the court sustains defendant's *Daubert* challenge and grants its motion for summary judgment. The court will enter final judgment in favor of defendant.

So ordered.