**Janet BICKEL and Joseph Bickel, Plaintiffs,**

v.

**PFIZER, INC., Warner–Lambert Co., Parke–Davis, Defendants.**

No. 1:03–CV–372–TS.

United States District Court, N.D. Indiana, Fort Wayne Division.

May 19, 2006.

Beverly H. Pace, PHV, Calvin S. Tregre, PHV, Janet G. Abaray, PHV, Lopez Hodes Restaino Milman & Skikos, Cincinnati, OH, Richard Delaney, Bendall Delaney Hartburg Mcneely & Roth LLP, Huntington, IN, for Plaintiffs.

Mark S. Cheffo, PHV, Skadden Arps Slate Meagher & Flom LLP, New York City, J. Stephen Bennett, Baker & Daniels, Fort Wayne, IN, Thomas G. Stayton, Baker & Daniels, Indianapolis, IN, for Defendants.

## OPINION AND ORDER

SPRINGMANN, District Judge.

Plaintiff Janet Bickel alleges in this product liability case that she suffered

strokes of the optic nerves and partial vision impairment as a direct result of ingesting Lipitor, a cholesterol lowering statin drug. She designated Dr. Valerie A. Purvin, a neuro-ophthalmologist and one of her treating physicians, as her expert witness on medical causation. The Defendants, Pfizer, Inc., Warner–Lambert Company LLC, and Parke–Davis, have challenged the admissibility of Dr. Purvin's opinion testimony. The Defendants contend that Dr. Purvin's testimony is inadmissible under Federal Rule of Evidence 702, as interpreted by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Fuesting v. Zimmer, Inc.*, 421 F.3d 528 (7th Cir.2005). They argue that without admissible evidence of causation, the Plaintiff's claims fail as a matter of law.

## PROCEDURAL BACKGROUND

On October 3, 2003, the Plaintiffs filed their Complaint against the Defendants asserting claims for strict product liability, negligence, breach of express and implied warranty, negligent misrepresentation and fraud, negligent infliction of emotional distress, loss of consortium, and punitive damages, arising out of injuries allegedly caused by the prescription drug Lipitor. The Plaintiffs invoked the Court's federal diversity jurisdiction. On December 12, 2003, the Defendants filed their Answer.

On October 26, 2005, the Defendants moved to exclude the opinions of Dr. Valerie A. Purvin, the Plaintiffs' designated expert. On November 21, the Plaintiffs filed their memorandum in opposition to the Defendants' motion to exclude and, on December 2, the Defendants replied.

On February 1, 2006, the Defendants moved for summary judgment on all the Plaintiffs' claims, in accordance with the parties' joint scheduling order deadline for dispositive motions. The Defendants argued that summary judgment was appro-

priate on all the Plaintiffs' claims because they had no admissible evidence of causation. They also argued an independent basis for dismissal: the Plaintiffs could not satisfy the elements of failure to warn under the Indiana Products Liability Act (IPLA). On March 13, the Plaintiffs filed their response and on March 31 the Defendants replied.

## FACTUAL BACKGROUND

Janet Bickel's primary care physician, Dr. William Webb, prescribed Lipitor to her in October 2001 for treatment of hyperlipidemia after he determined that she was not reaching her cholesterol goal on Zocor, another statin drug. Shortly after using Lipitor, the Plaintiff began experiencing body and joint pain and swelling of the eyes. In early February 2002, she called to report these symptoms to Dr. Webb, and he advised her to stop taking Lipitor.

The Plaintiff did so and her symptoms subsided. However, on March 1, 2002, she awoke from her sleep with blurriness and partial vision loss in her right eye. Dr. Harman and Dr. Walker treated her, as did Dr. Dykstra, who diagnosed her on March 19 with anterior ischemic optic neuropathy (AION). On April 4, 2002, the Plaintiff was diagnosed with bilateral AION, or AION in both eyes, after she complained of fuzziness and a strange sensation in her left eye. Dr. Dykstra referred the Plaintiff to Dr. Purvin for further examination and treatment.

Dr. Purvin saw the Plaintiff on April 16, 2002, and twice thereafter. After her first examination, Dr. Purvin wrote to Dr. Dykstra wondering if the Plaintiff had some immune complex disease or other form of vasculitis that was induced by the Lipitor and which "could perhaps have contributed to her ischemic optic neuropa-

thy." She indicated that she would look into it further.

On May 23, 2003, Dr. Purvin provided her expert Report regarding causation. The opinions provided in this Report are the subject of the motion to exclude testimony under Federal Rule of Evidence 702.

## DISCUSSION

### A. Standard for Admitting Expert Testimony

■ For expert testimony to be admissible, it must be relevant and reliable, as required by Federal Rule of Evidence 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. The Supreme Court in *Daubert* stated that Rule 702 required the district court to perform a "gate-keeping function" before admitting expert scientific testimony, to ensure that it is not only relevant, but reliable. 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469. The purpose of the rule in Daubert "was to make sure that when scientists testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work." *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996).

■ *Daubert* listed four factors to be considered when determining whether scientific evidence is reliable: 1) whether the theory or technique can be or has been tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) whether there are standards controlling the technique's operation and its known or potential rate of error; and 4) whether the theory or technique has gained widespread acceptance in the relevant scientific community. 509 U.S. at 593–94, 113 S.Ct. 2786. Also, the 2000 Advisory Committee's Notes to Rule 702 suggest other factors to determine expert reliability, including:

> (5) whether "maintenance standards and controls" exist; (6) whether the testimony relates to "matters growing naturally and directly out of research they have conducted independent of the litigation," or developed "expressly for purposes of testifying"; (7) "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion"; (8) "[w]hether the expert has adequately accounted for obvious alternative explanations"; (9) "[w]hether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting"; and (10) "[w]hether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give."

*Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 534–35 (7th Cir.2005) (quoting Fed.R.Evid. 702 advisory committee's notes (2000 amendments)). The list is not exclusive, and the Supreme Court emphasized the inquiry is a flexible one: "Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 594–95, 113 S.Ct. 2786. A witness's own training and experience may be the foundation for an expert opinion, but "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient

basis for the opinion, and how that experience is reliably applied to the facts." Fed. R.Evid. 702 (advisory committee's notes (2000 amendments)). The burden of showing an expert's testimony to be relevant and reliable is with the proponent of the evidence. *Bradley v. Brown*, 852 F.Supp. 690, 697 (N.D.Ind.1994).

## B. Dr. Purvin's Opinion

Dr. Purvin's expert opinion is that Lipitor, a member of the class of cholesterol lowering drugs known as statins, most likely caused the Plaintiff's AION, commonly known as a stroke of the optic nerve. She based her opinion and her May 23, 2005, Report on her review of the Plaintiff's medical records, adverse event reports from Pfizer, FDA approval package for Lipitor, Adverse Ocular Side-effects of Commonly Prescribed Systematic Medications, WHO Pharmaceuticals Newsletter No. 2, 2002, and results of a Med Line search regarding vasculitis related to the use of statin drugs.

In her Report, Dr. Purvin noted that she had diagnosed the Plaintiff with bilateral sequential non-arteritic anterior ischemic optic neuropathy (NAION) on the basis of the Plaintiff's clinical features. She stated in her Report that AION is "a relatively common condition in which the optic nerve suffers damage due to insufficient blood supply." (Report at 1.) She explained the difference, both in causes and clinical features, between arteritic and non-arteritic forms of AION. Arteritic AION is typically caused by Giant Cell Arteritis (GCA), an autoimmune disease that effects elderly people. NAION usually affects middle aged people with risk factors for hardening of the arteries. Other risk factors for NAION include a small crowded disk and a transient drop in blood pressure.

Dr. Purvin explained that it was highly atypical for patients with NAION to experience visual loss in the fellow eye in just one month, as the Plaintiff had. Usually this occurs months to years later. Therefore, Dr. Purvin considered whether the Plaintiff might have had some form of underlying vasculitis. During the months before her visual loss, the Plaintiff experienced joint pains, muscle aches, and fatigue. These symptoms began shortly after the Plaintiff began taking Lipitor and resolved promptly when she stopped taking the medication. Dr. Purvin therefore "considered the possibility that Mrs. Bickel might have an autoimmune vasculitis induced by Lipitor." (Report at 2.)

Dr. Purvin then posed the question, "Is there any reason to think that Lipitor might have caused an autoimmune vasculitis in this patient?" She responded by noting that a review of literature revealed several previous reports of autoimmune disorders, including vasculitis in patients on various statin drugs. According to the Report, "a causal association had been proposed." (Report at 2.) These hypersensitivity reactions are considered to be rare. However, typical NAION in a patient on a statin drug is not rare and "could easily be attributed to the fact that the hyperlipidemia that these drugs are designed to treat is a risk factor for this form of optic neuropathy." (Report at 3.) Dr. Purvin further stated, "What we'd like to know is whether the occurrence of NAION is perhaps more common in patients on statin drugs than in a group with similar vascular risk factors who are not taking statins." (*Id.*) She cited one report that noted four cases of AION in patients taking atorvastatin with the comment that the association "stands out from the background rate." (*Id.*) (citing report from Indian National Pharmacovigilance Centre, cited in WHO Adverse Drug Reactions Database). Dr. Purvin made no additional comment on this report other than to note that "[f]urther studies would be required to determine if in fact statin medications might promote rather

than prevent vaso-occlusive events in some individuals." *(Id.)*

Dr. Purvin summarized that it was more likely than not that the Plaintiff's bilateral visual loss was caused by Lipitor. She proposed that a drug-induced vasculitis caused narrowing of the arteries supplying the optic disc and resulted in AION. The clinical factors that suggested this were the unusual time course of loss in the two eyes and her preceding symptoms that were temporally associated with taking Lipitor. She noted that precedent existed in the medical literature for concluding that Lipitor could produce such a syndrome and the injury was consistent with the known hypersensitivity reactions to Lipitor.

## C. Application of Standard to Dr. Purvin's Opinion Testimony

■■ The factors listed in *Daubert,* although not pertinent in assessing the reliability of expert testimony in every case, "are precisely apt for analysis here." *Fuesting,* 421 F.3d at 535 (noting that *Daubert* concerned the admissibility of expert testimony regarding the deleterious medical effects of introducing a drug into the human body). The district court must assess the reliability of the methodology the expert has employed in arriving at her opinion. *Fuesting,* 421 F.3d at 535. "The first and most significant *Daubert* factor is whether the scientific theory has been subjected to the scientific method." *Bradley v. Brown,* 42 F.3d 434, 438 (7th Cir.1994); *Caraker v. Sandoz Pharm. Corp.,* 188 F.Supp.2d 1026, 1030 (S.D.Ill.2001) ("The hallmark of this reliability prong is the scientific method, i.e., the generation of testable hypotheses that are then subjected to the real world crucible of experimen-

tation, falsification/validation, and replication.").

■■ Here, Dr. Purvin did not rely upon any valid scientific methodology in forming her opinion, particularly epidemiology, toxicology, or pharmacology. She did not conduct any scientific tests, experiments, or clinical studies to bolster her theory that statins can cause AION nor did she produce or rely upon any such studies to verify her conclusions. "Such insulation of [her] theory from the dispassionate crucible deeply, if not fatally, compromises [her] testimony's reliability." *Fuesting,* 421 F.3d at 536. Additionally, Dr. Purvin's field of expertise, neuro-opthalmology, is not known to reach reliable results for the type of causation opinion she has proffered. Dr. Purvin testified that she has no special expertise other than medical school and residency. (Dr. Purvin Dep. at 19.)

Focusing in on the Defendants' argument regarding a lack of epidemiological studies, the Plaintiffs argue that such studies are not necessary and that Dr. Purvin's opinion is properly based on non-epidemiological factors.[1] "Under the *Daubert* standard, epidemiological studies are not necessarily required to prove causation, as long as the methodology employed by the expert in reaching his or her conclusion is sound." *Benedi v. McNeil–P.P.C., Inc.,* 66 F.3d 1378, 1384 (4th Cir.1995). However,

> Epidemiologic studies are the primary, generally accepted methodology for demonstrating a causal relation between a chemical and the set of symptoms or a disease. *Conde v. Velsicol Chemical Corp.,* 804 F.Supp. 972, 1025–26 (S.D.Ohio 1992), *affirmed* 24 F.3d 809 (6th Cir.1994). *See also Brock v. Merrell Dow Pharmaceuticals, Inc.,* 874 F.2d 307, 311, *modified* 884 F.2d 166

---

1. Epidemiological studies are studies of large numbers of humans exposed to some chemical in order to determine if they are more likely to get a particular disease or diseases than people not so exposed.

(5th Cir.1989) (rejecting bendectin plaintiffs' reliance on non-epidemiological causation evidence, finding "the most useful and conclusive type of evidence in a case such as this is epidemiological studies.").

*Rains v. PPG Indus., Inc.,* 361 F.Supp.2d 829, 834 (S.D.Ill.2004); *see also Siharath v. Sandoz Pharm. Corp.,* 131 F.Supp.2d 1347, 1356 (N.D.Ga.2001) ("The existence of relevant epidemiological studies can be a significant factor in proving general causation in toxic tort cases. Indeed, epidemiological studies provide the primary generally accepted methodology for demonstrating a causal relation between a chemical compound and a set of symptoms or disease.") *aff'd sub nom. Rider,* 295 F.3d 1194 (11th Cir.2002) (quotations and citations omitted). In addition, at least one of the cases cited by the Plaintiff in support of her contention that courts have held that reliance on non-epidemiological evidence is admissible to prove causation actually applied conventional epidemiological methods and criteria to determine causation. *See Ambrosini v. Labarraque,* 101 F.3d 129, 136 (D.C.Cir.1996) (finding that expert's testimony regarding drug's general causation of birth defects survived the reliability prong of *Daubert* where his conclusions were premised on "conventional epidemiological methods").

To be clear, it is not the lack of epidemiological studies linking Lipitor, or other statins, to AION, that is fatal to Dr. Purvin's opinion; it is her failure to apply any scientific methodology. The Plaintiffs claim that Dr. Purvin relied largely on her differential diagnosis.[2] They contend that Dr. Purvin considered all the possibilities that could cause the sequence of events and concluded that it was more likely than not that the Plaintiff's use of Lipitor caused her AION. The Plaintiff argues that Dr. Purvin made a reliable differential diagnosis to conclude that her AION was more likely caused by Lipitor. Even assuming that Dr. Purvin applied the differential diagnosis method, the Plaintiff cannot rely on such diagnosis to establish general causation.

> [D]ifferential diagnosis does not by itself prove the cause, even for the particular patient. Nor can the technique speak to the issue of general causation. Indeed, differential diagnosis assumes that general causation has been proven for the list of possible causes it eliminates.

*Lennon v. Norfolk and W. Ry. Co.,* 123 F.Supp.2d 1143, 1153–54 (N.D.Ind.2000). The Court in *Lennon,* provided the following explanation:

> The process of differential diagnosis is undoubtedly important to the question of "specific causation." If other possible causes of an injury cannot be ruled out, or at least the possibility of their contribution to causation minimized, then the "more likely than not" threshold for proving causation may not be met. But, it is also important to recognize that a fundamental assumption underlying this method is that the final, suspected "cause" remaining after this process of elimination must actually be capable of causing the injury. That is, the expert must "rule in" the suspected cause as well as "rule out" other possible causes. And, of course, expert opinion on this issue of "general causation" must be derived from scientifically valid methodology.

*Id.* at 1154 (citing *Hall v. Baxter Healthcare Corp.,* 947 F.Supp. 1387, 1413 (D.Or. 1996)) (quoting *Cavallo v. Star Enter.,* 892 F.Supp. 756, 771 (E.D.Va.1995), *aff'd. on*

---

**2.** "Differential diagnosis" is "a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 262 (4th Cir.1999).

*this ground, rev'd on other grounds,* 100 F.3d 1150 (4th Cir.1996)).

> Differential diagnosis may be utilized by a clinician to determine what recognized disease or symptom the patient has, but it is incapable of determining whether exposure to a substance . . . caused disease in the legal sense. Simply put, an untested hypothesis cannot be a scientifically reliable basis for an opinion based on causation.

*Id.* (citing *In re Breast Implant Litigation,* 11 F.Supp.2d 1217, 1230 (D.Co.1998)) (quotation marks and brackets omitted).

■ Without proof of general causation, Dr. Purvin could not "rule in" Lipitor as a cause of the Plaintiff's AION in any differential diagnosis. As it stands, Dr. Purvin's opinion regarding general causation is an untested hypothesis. As Judge Posner has stated, "the courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it." *Rosen,* 78 F.3d at 319.

The Plaintiffs also argue that Dr. Purvin cited to published medical literature for the proposition that statins can cause vasculitis, which can lead to AION. The Plaintiffs' argument overlooks the fact that the medical literature did not cite a causal relationship between vasculitis and AION. In fact, Dr. Purvin testified that there it no peer-reviewed literature linking statins or statin induced vasculitis to AION. (Purvin Dep. at 55–56.) The literature that Dr. Purvin did cite in her Report related only to statin drugs and vasculitis, not AION, and then only "proposed" a connection. She also stated that she was not aware of any epidemiological or peer-reviewed data that linked Lipitor to AION. (Purvin Dep. at 50.) Dr. Purvin did point to one, as she called it, "odd source," cited by the World Health Organization that noted an association between statin drugs and AION that stood out. (*Id.* at 47–48.) But Dr. Purvin stated in her Report that further studies would be required. In her deposition, she testified that the World Health Organization newsletter was not a very critical review and was unreliable and unhelpful in her analysis. (Purvin Dep. at 48, 148, 157–58, 167). She did not even see the underlying reports. (*Id.* at 150.) Thus, one article noted by Dr. Purvin did not, contrary to the Plaintiffs' claim, establish the link between Lipitor and AION and the other was not even useful to Dr. Purvin in arriving at her opinion.

In addition, Dr. Purvin's theory has not been published and peer reviewed. Her explanation for this is telling. She indicated that the Plaintiff's case was not strong enough by itself to publish as a case report; it was "suggestive, suspicious, intriguing, plausible, but not proven." (Purvin Dep. at 214). She did not know whether the Plaintiff had vasculitis, and if she did, whether it was caused by a statin. (*Id.* at 137.)

Although Dr. Purvin's theory is not generally accepted, (*Id.* at 148), the Plaintiffs believe that they should not be barred from having their day in court simply because medical literature showing a connection between her condition and Lipitor does not yet exist. (DE 48 at 10) (citing *Bonner v. ISP Techs., Inc.,* 259 F.3d 924, 928 (8th Cir.2001)) ("The first several victims of a new toxic tort should not be barred from having their day in court simply because the medical literature, which will eventually show the connection between the victims' condition and the toxic substance, has not yet been completed.") There is no evidence that any literature regarding a connection between Lipitor and AION is forthcoming. Moreover, it is not the novelty of Dr. Purvin's theory that calls for its exclusion; it is the lack of a reliable scientific methodology, and application of that methodology, that warrants it.

### D. Motion for Summary Judgment

One of the bases for the Defendants' motion for summary judgment relates directly to the Plaintiffs' evidence of causation. The Defendants argue that the Plaintiffs cannot prove causation, a required element, because their only expert on the subject is fundamentally unreliable and her opinions are inadmissible. Accordingly, they insist that all the Plaintiffs' claims should be dismissed.

The Court, having found that Dr. Purvin's testimony is not admissible to prove causation, agrees that the Plaintiffs' claims should be dismissed. *See Korte v. Exxonmobil Coal USA, Inc.,* 164 Fed.Appx 553, 556 (7th Cir.2006) ("Expert testimony is needed to establish causation in cases alleging an adverse health effect when the 'medical effects [of exposure to the toxin] are not within the ken of the ordinary person.'") (alterations in original) (quoting *Goffman v. Gross,* 59 F.3d 668, 672 (7th Cir.1995)); *Fuesting v. Zimmer, Inc.,* 421 F.3d 528, 537–38 (7th Cir.2005) (directing judgment for defendant orthopaedic implant manufacturer where plaintiff's expert testimony on causation was inadmissible because plaintiff could not establish requisite elements of strict products liability and negligence claims). Because the Plaintiff cannot make a showing sufficient to establish the existence of an element essential to her case, on which she would bear the burden of proof at trial, the Defendant is entitled to judgment as a matter of law.

### CONCLUSION AND ORDER

For the foregoing reasons, the Defendants' Motion in Limine to Exclude Expert Opinions [DE 42] is GRANTED. The Defendants' Motion for Summary Judgment [DE 50] is GRANTED. Judgment will be entered in favor of the Defendants and against the Plaintiffs.